UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| Jeffery Haynes, | ) | |
| | ) | No. 12 C 2980 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Judge Thomas M. Durkin |
| | ) | |
| City of Chicago, Ed H. Smith, | ) | |
| and Mort Levy, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jeffery Haynes brings this action against the City of Chicago (the "City"), former 28th Ward Alderman Ed Smith ("Alderman Smith"), and Mort Levy. Haynes asserts claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961, *et seq.*, the Due Process Clause of the 14th Amendment, *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978), and several state law theories. The City and Alderman Smith moved to dismiss Haynes' complaint for failure to state a claim. R. 15. Levy joined the motion. R. 26. For the following reasons, Defendants' motion to dismiss is granted.

**Background**[1]

This case involves Haynes' attempt to develop a shopping center and grocery store in Alderman Smith's former ward on the west side of Chicago. Haynes' plan called for the City, using tax increment financing, to acquire various privately

---

[1] The following background is taken from the allegations in Haynes' complaint, which the Court accepts as true for purposes of a motion to dismiss.

1

owned parcels of land through eminent domain and then sell those parcels (along with some parcels already owned by the City) to Haynes. Over the course of several years, Haynes spent approximately $160,000 planning the project. But after more than two years of consistent support from Alderman Smith, Haynes was ultimately shut out of the project after Alderman Smith threw his support to a competing plan that did not involve Haynes. Haynes alleges that Alderman Smith changed his tune because Haynes refused his requests for a $5,000 "contribution."

Haynes first approached Alderman Smith in February 2007 with a proposal to develop a shopping center. The proposed location for the shopping center was in an area covered by the Madison/Austin Tax Increment Financing Redevelopment Project Area Redevelopment Plan ("TIF Plan"). The TIF Plan was originally adopted by the City in 1999 to encourage private development in the area. Alderman Smith supported Haynes' proposal. He wrote to the City's Department of Planning & Development ("Planning Department") to express his formal support for Haynes to acquire land owned by the City and asked the Planning Department to begin the eminent domain process for several privately-owned parcels.

In April 2007, Haynes submitted a detailed "Negotiated Sale Application" to purchase certain City-owned property. A Negotiated Sale Application must be approved by the Planning Department's Community Development Commission ("CDC"). Once approved, the applicant and the City negotiate a "Redevelopment Agreement," which is then submitted to the City Council for approval. None of that

happened here—Haynes' Negotiated Sale Application was never approved, and Haynes and the City never negotiated or executed a Redevelopment Agreement.

Over the next year, Haynes and Alderman Smith discussed and agreed upon various changes to the proposed project. Although Haynes' initial focus was to develop a shopping center, in March 2008 Alderman Smith suggested including a grocery store as an anchor tenant because the area had been identified as a "food desert" that did not have access to fresh fruits, vegetables, and meats.

Also in March 2008, the CDC passed a resolution authorizing the City to acquire certain privately-owned property for the project pursuant to the TIF Plan. In May 2008, the City Council's Committee on Housing and Real Estate voted to approve the resolution. Around the same time, Alderman Smith again wrote to the Planning Department expressing his formal support for Haynes to acquire land owned by the City. He also asked the Planning Department to begin the eminent domain process for several additional privately-owned parcels. Haynes twice met with the Planning Department to provide updates on his project.

In July 2008, Haynes reached out to Levy, the President of Moo & Oink grocery stores, about the possibility of using Moo & Oink as an anchor tenant in the project. In August 2008, Haynes and Alderman Smith met with Levy and other Moo & Oink representatives. This was when Haynes' plans began to unravel. Moo & Oink asked questions about Haynes' financing that Haynes felt were "inappropriate" and "borderline racist." Moo & Oink also asked about the possibility

of buying the property itself and simply hiring Haynes to build the store. After the meeting, Haynes began reaching out to several other grocery store chains.

In March 2009, Alderman Smith called and told Haynes that Levy had just left his office and that Levy was talking to the Planning Department about building a Moo & Oink store on the project site without Haynes' involvement. Alderman Smith relayed to Haynes that he had told Levy that Moo & Oink could not do anything at the project site without Haynes. That same month, Alderman Smith once again wrote to the Planning Department expressing his formal support for Haynes to acquire and develop land owned by the City.

A few weeks later, Alderman Smith and several staff members from the Planning Department told Haynes that Moo & Oink had indicated that it would like to a build a store on the project site with Haynes as the developer. Haynes and his team then met with Levy and his team to discuss and plan for the project. But all was not well. Moo & Oink informed Haynes that it still wished to own the property where the grocery store would be built. The relationship deteriorated from there as neither side was willing to compromise on who would own the property.

Haynes then alleges that from June through August 2009, Alderman Smith demanded a $5,000 "contribution" from Haynes. Alderman Smith eventually gave Haynes an August 17, 2009 deadline for providing the contribution. Haynes construed these demands as a request for a bride in order to secure Alderman Smith's continued support for the project and refused to comply.

4

On August 23, 2009, six days after the deadline for Haynes to provide the $5,000 contribution, Haynes told Alderman Smith that he had two other grocery stores—Lemington's and One Stop—interested in the project. But Alderman Smith responded that only Moo & Oink could build a grocery store in his ward. The next day, Haynes met with Alderman Smith, the Planning Department, and Moo & Oink. At the meeting, Alderman Smith announced that Moo & Oink could build a grocery store on the project site with or without Haynes' involvement. This meeting led Haynes to try working with Moo & Oink one last time so that the time and money he had spent planning the project would not go to waste.

On August 28, 2009, the City's Department of Community Development sent Haynes a letter requesting various information on the project in order to initiate a negotiated sale and/or Tax Increment Financing application process. On October 8, 2009, the Department of Community Development sent Haynes another letter requesting additional information, again in order to initiate a negotiated sale and/or Tax Increment Financing application process.

On October 24, 2009, Levy sent Haynes an email notifying him that Moo & Oink would purchase land at the project site from the City and develop it without Haynes. Levy claimed that Haynes had requested to withdraw from the project because he did not have financing (Haynes denies this). The email also stated that Levy had met with Alderman Smith and that Alderman Smith would support Moo & Oink's efforts to build a grocery store without Haynes.

From that point on, Haynes was on the outside looking in. Haynes alleges that Moo & Oink proceeded with plans to build a grocery store and that the City removed Haynes from the project without notice. Haynes tried raising the issue with Mayor Daley and various members of his staff from 2009 through 2011. The Mayor's staff attempted to facilitate some discussions between Haynes and Wal-Mart officials as an alternative, but those talks did not go anywhere.

**Legal Standard**

A Rule 12(b)(6) motion challenges the sufficiency of the complaint. *See, e.g., Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7,* 570 F.3d 811, 820 (7th Cir. 2009). A plaintiff's complaint "must be enough to raise a right to relief above the speculative level," *Bell Atlantic v. Twombly,* 550 U.S. 544, 555 (2007), and "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (quoting *Twombly,* 550 U.S. at 570). "In evaluating the sufficiency of the complaint, [courts] view it in the light most favorable to the plaintiff, taking as true all well-pleaded factual allegations and making all possible inferences from the allegations in the plaintiff's favor." *AnchorBank, FSB v. Hofer,* 649 F.3d 610, 614 (7th Cir. 2011). *Pro se* complaints are liberally construed and are held to a less stringent standard than pleadings drafted by lawyers. *See, e.g., Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Munson v. Gaetz*, 673 F.3d 630, 633 (7th Cir. 2012).

## Analysis

### I. RICO (Counts I & II)

In Counts I and II, Haynes asserts civil RICO claims against Alderman Smith and Levy. Haynes alleges that Alderman Smith violated 18 U.S.C. § 1962(a) and that Alderman Smith and Levy each violated 18 U.S.C. § 1962(d).

At the outset, the Court notes that RICO "does not cover all instances of wrongdoing. Rather, it is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006); *see also Jennings v. Auto Meter Prods., Inc.*, 495 F.3d 466, 472 (7th Cir. 2007). "RICO has not federalized every state common-law cause of action available to remedy business deals gone sour." *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992); *see also Carr v. Tillery*, 591 F.3d 909, 918 (7th Cir. 2010); *Dremco, Inc. v. Diver*, 2013 WL 1873917, at *3 (N.D. Ill. May 3, 2013).

18 U.S.C. § 1962(a) provides, in pertinent part, that:

> It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity . . . to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

Thus, to state a § 1962(a) claim, a plaintiff must adequately allege that a defendant: (1) received income from a pattern of racketeering activity; (2) used or invested that income in the operation of an enterprise; and (3) caused the injury complained of by the use or investment of racketeering income in an enterprise. *Rao v. BP Prods. N.*

*Am., Inc.*, 589 F.3d 389, 398-99 (7th Cir. 2009) (citing *Vicom, Inc., v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 n. 6 (7th Cir. 1994)).

Here, even if all the facts alleged by Haynes are true (which the Court assumes for purposes of a motion to dismiss), those facts simply do not fit a cause of action under § 1962(a). There is no suggestion that Alderman Smith received income, used or invested the income in the operation of a RICO enterprise, or caused Haynes' alleged injuries by the use or investment of the income in a RICO enterprise. *Vicom*, 20 F.3d at 778 n.6 ("[T]he use or investment of the racketeering income must proximately cause the plaintiff's injury; injury caused by the predicate racketeering acts is inadequate."). At most, Haynes alleges that Alderman Smith tried unsuccessfully to shake him down for a $5,000 contribution. These allegations fall short of pleading the required elements under § 1962(a).

The first element of a § 1962(a) claim also requires a plaintiff to allege that the defendant received income through "a pattern of racketeering activity." *Vicom*, 20 F.3d at 779 ("[A] 'pattern of racketeering activity' must exist to find a violation of [§ 1962(a)]."). "[C]ourts carefully scrutinize the pattern requirement to 'forestall RICO's use against isolated or sporadic criminal activity.'" *Jennings*, 495 F.3d at 472 (quoting *Midwest Grinding*, 976 F.2d at 1022).

By definition, a "pattern" requires at least two predicate acts of racketeering activity within a 10-year period. 18 U.S.C. § 1961(5). Predicate acts are acts indictable under a specified list of criminal laws. 18 U.S.C. § 1961(1).

8

Moreover, although two predicate acts are *necessary*, that alone is not *sufficient* to establish a pattern of racketeering activity. *H. J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 237-38 (1989). Ultimately, a civil RICO plaintiff must satisfy the "continuity plus relationship" test: "the predicate acts must be related to one another (the relationship prong) *and* pose a threat of continued criminal activity (the continuity prong)." *Midwest Grinding*, 976 F.2d at 1022 (emphasis in original). In assessing continuity, "[r]elevant factors include the number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Jennings*, 495 F.3d at 473 (quoting *Morgan v. Bank of Waukegan*, 804 F.2d 970, 976 (7th Cir. 1986)). No one factor is necessarily determinative. *Id.* Rather, courts evaluate a plaintiff's allegations on a case-by-case basis with the goal of "achieving a natural and commonsense result, consistent with Congress's concern with long-term criminal conduct." *Id.* (quoting *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Illinois*, 424 F.3d 659, 673 (7th Cir. 2005)).

Haynes does not allege a "pattern" because he has only identified one act that potentially qualifies as racketeering activity under 18 U.S.C. § 1961(1)—Alderman Smith's alleged request for a $5,000 bribe. And even if the Court were to construe multiple requests for the same bribe as separate acts, Haynes' claim would still fall short. To show a pattern, "'predicate acts' must 'extend[] over a substantial period of time'; 'a few weeks or months' is considered insubstantial." *Midwest Grinding*, 976 F.2d at 1024 (quoting *H.J., Inc.*, 492 U.S. at 242). Moreover, a single scheme to

9

inflict a single injury on a single victim is generally not enough to establish a "pattern." *Dremco*, 2013 WL 1873917, at *5-7 (collecting cases). As a result, even if the facts pled by Haynes could potentially fit the elements of a § 1962(a) claim, Haynes has not come close to alleging a "pattern of racketeering activity."

Haynes' RICO conspiracy claim fails for similar reasons. "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 732 (7th Cir. 1998). To state a claim under § 1962(d), a plaintiff "must allege (1) that each defendant agreed to maintain an interest in or control of an enterprise or to participate in the affairs of an enterprise through a pattern of racketeering activity and (2) that each defendant further agreed that someone would commit at least two predicate acts to accomplish those goals." *Id.*; *see also DeGuelle v. Camilli*, 664 F.3d 192, 204 (7th Cir. 2011); *Slaney v. Int'l Amateur Ath. Fed'n*, 244 F.3d 580, 600 (7th Cir. 2001).

Again, Haynes has not alleged any agreement involving a pattern of racketeering activity or that Alderman Smith or Levy agreed that someone would commit at least two predicate acts. At most, Haynes alleges that Alderman Smith and Levy engaged in a single scheme to cut him out of the project and that Alderman Smith committed a predicate act in the process. The facts alleged by Haynes do not involve any agreement to participate in an endeavor which, if completed, would constitute a substantive violation of RICO.

## II. Due Process (Count III)

In Count III, Haynes alleges that the City violated his procedural due process rights under the 14th Amendment. U.S. Const. amend. XIV, § 1 ("No state shall . . . deprive any person of life, liberty, or property, without due process of law."). Haynes alleges that the City "[led] him on to spend money on the project to build a shopping center and grocery store facility under the TIF program, accepting his application for doing so and requiring him to spend significant sums of money . . . , but then removing him from the project without any written notice." Compl. ¶ 78.

To state a procedural due process claim, a plaintiff must allege (1) a cognizable property interest, (2) a deprivation of that property interest, and (3) a denial of due process. *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004); *see also Khan v. Bland*, 630 F.3d 519, 527 (7th Cir. 2010).

A cognizable property interest in a benefit exists only if a plaintiff has "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972). A benefit "is not a protected entitlement if government officials may grant or deny it in their discretion." *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 756 (2005); *see also Brown v. Michigan City*, 462 F.3d 720, 729 (7th Cir. 2006) ("A property interest of constitutional magnitude exists only when the state's discretion is 'clearly limited' such that the plaintiff cannot be denied the interest 'unless specific conditions are met.'") (citation omitted); *Mid-Am. Waste Sys., Inc. v. City of Garland*, 49 F.3d 286, 289 (7th Cir. 1995) ("property is whatever is 'securely and durably yours . . . as

distinct from what you hold subject to so many conditions as to make your interest meager, transitory, or uncertain'") (citation omitted).

The question of whether Haynes had a cognizable property interest is ultimately determined by state and local law. *Roth*, 408 U.S. at 577-78; *Gonzalez*, 545 U.S. at 756.

In Illinois, a "disappointed bidder" generally does not have a property interest in the award of a public contract. *Kim Constr. Co. v. Bd. of Trustees*, 14 F.3d 1243, 1246-47 (7th Cir. 1994); *see also Szabo Food Serv., Inc. v. Canteen Corp.*, 823 F.2d 1073, 1080 (7th Cir. 1987) ("A unilateral expectation of renewal [of a public contract] is not a property interest.").

*Norflo Holding Corp. v. City of Chicago*, 2002 WL 453605 (N.D. Ill. Mar. 25, 2002), is particularly instructive. *Norflo* involved "EZ/EC funds," federal and state funds managed by the City to promote development in economically disadvantaged areas. The fund application process has two steps: applications are reviewed by a Community Coordinating Council, which then makes recommendations to the City Council for final approval. The developer in *Norflo* applied for almost $600,000 in funds to renovate two properties. The Coordinating Council approved the developer's application, but the City Council ultimately provided funding for only 35 of 50 applications recommended by the Coordinating Council. The developer's application was not among them. *Id.* at *2-3. The court rejected the developer's procedural due process claims, holding that "approval of an application for funding

12

by a public official or entity where no actual contract has been entered into does not create a substantive property interest." *Id.* at *5.

Haynes' purported property interest is even more remote than the interest found insufficient in *Norflo*. As with the EZ/EC funds at issue in *Norflo*, Haynes alleges that there is a two-step process for acquiring City-owned property: the CDC must approve a Negotiated Sale Application, and then the City Council must approve a Redevelopment Agreement that is negotiated between the applicant and the City. Compl. ¶ 11. Unlike in *Norflo*, Haynes did not even advance past the first step to get to the City Council. In April 2007 and again in August and October 2009, Haynes submitted paperwork as part of the application process to purchase property from the City. But those applications were never even approved by the CDC. Haynes did not obtain a cognizable interest in City-owned property merely by submitting applications to acquire the property from the City, even if he spent money to prepare the applications and supporting project documents. Moreover, although Alderman Smith supported Haynes' efforts for some time, Alderman Smith did not have the authority to unilaterally approve Haynes' project or sell City property—that is why Alderman Smith instead wrote various letters to the Planning Department expressing his formal support for Haynes' project.

In short, Haynes has not alleged any cognizable property interest. The City did not enter into any agreement with Haynes that could have provided him with protected rights to City-owned property. As a result, the City was not required to

provide Haynes with any process before it apparently sold some of the property targeted by Haynes to a competing applicant.

## IV. *Monell* Liability (Count VII)

In Count VII, Haynes seeks to hold the City liable pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Haynes essentially alleges that it is the City's custom, practice, or official policy to rubber stamp projects within an alderman's ward that an alderman supports, and that as a result, "the actions of Alderman Smith constitute actions of the City." Compl. ¶ 97.

42 U.S.C. § 1983 provides a cause of action for deprivations, under color of law, of "'rights, privileges, or immunities secured by the Constitution and laws' of the United States." *Livadas v. Bradshaw*, 512 U.S. 107, 132 (1994). Section 1983 itself "creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *Oklahoma City v. Tuttle*, 471 U.S. 808, 817 (1985).

*Monell* provides the theory under which a municipality can be liable for its employees' § 1983 violations. Although "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," *Monell,* 436 U.S. at 691, a municipality may be liable "if its officers acted pursuant to: (1) an official policy; (2) a practice or custom that although not officially authorized, was widespread and well settled; or (3) instructions from a city official with final policy-making authority." *Gonzalez v. Vill. of W. Milwaukee*, 671 F.3d 649, 664 (7th Cir. 2012); *see also Thomas v. Cook Cnty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009).

Haynes' *Monell* claim is a nonstarter because he has not alleged that Alderman Smith violated his federal rights in the first place. As discussed above, Haynes has failed to state any plausible federal claim against Alderman Smith. As the Supreme Court explained in *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986), "[i]f a person has suffered no constitutional injury at the hands of the individual [employee], the fact that the [municipality] may have *authorized* [the allegedly wrongful act] is quite beside the point." (Emphasis in original).

Even if Haynes did sufficiently allege a violation of his federal rights, there is still a disconnect between the City's alleged wrongdoing and Haynes' injury. To proceed under *Monell*, a plaintiff must allege that the municipality "was directly responsible for the deprivation." *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001); *see also Monell*, 436 U.S. at 694 ("[I]t is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983."); *Estate of Novack v. County of Wood*, 226 F.3d 525, 530-31 (7th Cir. 2000) (for *Monell* liability to apply, "a municipal policy or practice must be the 'direct cause' or 'moving force' behind the constitutional violation") (citations omitted).

The City's alleged custom, practice, or official policy to approve projects in an alderman's ward that an alderman supports is not directly responsible for the alleged violation of Haynes' rights. Notably, Haynes does not allege that the City has a custom, practice, or official policy of requiring the payment of bribes to do

15

business, which is the gravamen of the allegations that Haynes levels against Alderman Smith in this case. The theory advanced by Haynes—that Alderman "Smith's decision to remove Haynes from the project became the decision of the City," Complaint ¶ 98—is ultimately more akin to *respondeat superior* liability, which does not apply to § 1983 claims. *Monell,* 436 U.S. at 691.

V.     **State Law Claims**

Haynes also alleges state law claims for tortious interference (Counts IV and V), common law fraud (Count VI), and promissory estoppel (Count VIII).

"Generally, when a court has dismissed all the federal claims in a lawsuit before trial, it should relinquish jurisdiction over supplemental state law claims rather than resolve them on the merits." *Cortezano v. Salin Bank & Trust Co.*, 680 F.3d 936, 941 (7th Cir. 2012); *see also* 28 U.S.C. § 1367(c)(3).

This case is no exception. In dismissing Haynes' federal claims, the Court has not committed substantial judicial resources to this matter. A plaintiff should not be allowed to bootstrap state law claims into federal court by asserting federal claims that cannot survive a motion to dismiss. Haynes' state law claims are also all subject to five-year statutes of limitation and can likely still be filed in state court. *See, e.g., Poulos v. Lutheran Soc. Servs.*, 728 N.E.2d 547, 559 (Ill. App. Ct. 2000) (tortious interference); *Khan v. BDO Seidman, LLP*, 977 N.E.2d 1236, 1242 (Ill. App. Ct. 2012) (common law fraud); *Chi. Limousine Serv., Inc. v. City of Chicago*, 781 N.E.2d 421, 428-29 (Ill. App. Ct. 2002) (promissory estoppel); *see also* 735 ILCS 5/13-217 (tolling statutes of limitation if an action "is dismissed by a United States

District Court for lack of jurisdiction"). The Court therefore declines to exercise supplemental jurisdiction over Haynes' state law claims.

## Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted. Haynes' federal claims are dismissed, and the Court declines to exercise supplemental jurisdiction over Haynes' remaining state law claims. Although *pro se* complaints are liberally construed, Haynes had no trouble laying out a very detailed history of the events in question. The Court understands Haynes' frustration that his redevelopment project did not materialize after years of planning, but Haynes has not identified any plausible federal claim that would entitle him to relief.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: August 12, 2013

17